# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID MEDNANSKY AND MARTINE MEDNANSKY,<br><br>           Plaintiffs,<br><br>     vs.<br><br>U.S.D.A. Forest Service employees THOMAS F. GILLETT, SUSAN DeSONIA, SALLY D. GOODRICH, RICH TOBIN, TINA TERREL, AND 10 Unknown U.S.D.A. Forest Service Employees, and the United States Government of America,<br><br>           Defendants. | CASE NO. 07CV1425-LAB (NLS)<br><br>**ORDER GRANTING *EX PARTE* APPLICATION FOR LEAVE TO FILE SUR-REPLY; AND**<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>[Docket nos. 13, 37] |

   Plaintiffs David and Martine Mednansky, residents in the Cleveland National Forest, filed this action pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), 42 U.S.C. §§ 1985(3) and 1986, and tort theories. The Complaint seeks money damages only. Thereafter, Plaintiffs failed to timely serve all but two of the individual Defendants, Defendants Gillett and DeSonia. The Court denied Plaintiffs' request for additional time to serve the other Defendants, finding Plaintiffs had not been diligent and had not shown good cause. Defendants have moved to dismiss the complaint. Following briefing on the motion to dismiss, Plaintiffs applied *ex parte* for leave to file a sur-reply.

**I.	Background**

Plaintiffs reside on federal land in the Cleveland National Forest in this District. Their residence is located on property they leased for twenty years beginning in 1999 or 2000 by a Forest Service Special Use Permit (the "Special Use Permit"), for which they pay an annual fee and are subject to certain requirements, including annual inspections.[1] Beginning in 2001, Plaintiffs allege a Forest Service employee came on their land and took away some garbage bags that had been set out for pickup by a private disposal company. They allege someone then mailed them clippings of names and addresses taken from their garbage, unaccompanied by a letter of explanation. (Compl. at 10:11–18, 11:1–18.) Although they did not understand what the implied message might have been, they believed it was intended to intimidate them in some way. (*Id.* at 10:14–18.) They allege after this, a Defendant Tobin, a district ranger, orally agreed no employee would ever come onto their lot in the future without an appointment.

They allege this agreement was honored until May and June of 2004, when unidentified Forest Service agents repeatedly harassed and threatened them and, causing them terror and severe emotional upset. (Compl. at 5:8–10:18.) Plaintiffs allege that as a result of the Forest Service agents' behavior, they lived in fear for their lives and they (particularly Ms. Mednansky) suffered emotional turmoil with attendant physical symptoms such as insomnia. (*Id.* at 13:10–17:12.) As a result, they allege that on July 6, 2004 they wrote to Forest Supervisor Dr. Ann Fege.

The first of the two allegedly harassing incidents occurred on May 28, 2004. (*See* Compl. at 8:27–10:2 (describing the incident).) Plaintiffs allege an unidentified Forest Service employee appeared unannounced near their residence, and when questioned, said she was there to conduct a fire hazard inspection. Mr. Mednansky and the Forest Service employee disagreed about whether the inspection could take place without an appointment,

---

[1] Plaintiffs have alleged the Special Use Permit provides that the only contact between them and the Forest Service consists of payment of their fees and a single annual inspection. (Compl. at 5:3–5.) Neither party submitted a copy of the Special Use Permit, so the court accepts these allegations as pleaded.

each threatened the other with arrest, and the employee left, "muttering words of retaliation." (*Id.* at 10:1–2.) Plaintiffs allege nothing on this date other than trespass, a disagreement about whether an appointment was necessary, and rudeness and belligerence on the Forest Service employee's part.

The principal allegations concern the events of June 9, 2004. Plaintiffs allege that around 2:00 p.m., at least six Forest Service vehicles, accompanied by a sheriff's vehicle, surrounded their residence and blocked Plaintiffs' vehicle in the driveway; Forest Service employees destroyed a padlock securing a chained driveway gate, stole the padlock, and then approached the residence. (Compl. at 5:8–17.) Plaintiffs allege at least eight Forest Service employees brandished handguns and positioned themselves around the residence, exhibiting "readiness for action." (*Id.* at 5:18–27.) Plaintiffs allege Ms. Mednansky saw this out of the windows, went out and asked what was going on, and was told they were there to do a fire inspection. (*Id.* at 6:1–9.) The Forest Service employee allegedly said Plaintiffs had hindered an earlier inspection attempt and had been rude and intimidating to the inspector, so they were present to protect the inspector. (*Id.* at 6:11–16.) A series of questions and responses allegedly followed in which Ms. Mednansky said they had not hindered the previous inspection,[2] and challenged the Forest Service's right to be present, to remove their padlock, to take their garbage away, and to behave in the manner they were behaving. (*Id.* at 6:16–7:20.) At some point during the exchange of questions and responses, Plaintiffs allege Ms. Mednansky began to be afraid for her safety. (*Id.* at 6:25–26.) After the questions and responses, they allege, she "fell into a stupor" but then apparently recovered and said she would send them a letter. (*Id.* at 7:15–20.)

Mr. Mednansky was not present for these events, but arrived minutes after Forest Service agents left, and consoled his wife. (Compl. at 7:22–27.) After some time, he says,

---

[2] According to the Complaint, this statement was not strictly true, because Mr. Mednansky had told the Forest Service employee to leave, threatened her with citizen's arrest and arrest by the sheriff, and threatened to sue her for harassment, at which point she left without conducting the inspection. (Compl. at 9:6–8, 9:25–10:2.) What Plaintiffs are apparently asserting is that he was justified in sending her away because she had not first gotten an appointment.

1  he was able to get the full story out of her, which outraged him and led him to believe the
2  Forest Service was attempting to drive them from their home. (*Id.* at 7:27–8:20.) Plaintiffs
3  believe the armed fire inspection was done in retaliation for their involvement with the events
4  of May 28, 2004. (*Id.* at 8:26–10:2.)

5  On July 9, Plaintiffs allege they received a reply from Defendant Gillett, who
6  apologized for any inconvenience, informed them they should not have a lock on their gate,
7  and agreed that Forest Service agents would honor the previous agreement not to come on
8  Plaintiffs' property in the future without an appointment. (Compl. at 17:18–24.) Plaintiffs say
9  they were dumbfounded at what they perceived as Defendant Gillett's trivializing of the
10 incident. (*Id.* at 17:26–18:4.) They say they wrote to Dr. Fege again, and Defendant again
11 replied, albeit contemptuously, asserting that his employees had felt threatened. (*Id.* at
12 18:9–18.) The second reply letter, they say, contained an admission that Gillett had ordered
13 an armed response on June 9, and a threat that Gillett "would not hesitate to take whatever
14 actions necessary to protect his employees." (*Id.* at 18:14–22.) He allegedly also said he
15 ordered law enforcement to be present during any future inspections. (*Id.* at 18:17–20.)

16 Thereafter, Plaintiffs say they wrote to Dr. Fege again, asking that she identify what
17 behavior of theirs had caused Forest Service employees to feel threatened. (Compl. at
18 19:7–10.) This time, they say, Defendant Gillett telephoned them on December 9, 2004 and
19 asked them to meet him at a coffee shop. (*Id.* at 19:12–15.) They say they declined,
20 thinking this request suspicious, and asked him never to call them again. (*Id.* at 19:15–22.)

21 Thereafter, Plaintiffs say Defendant Gillett provided them with conflicting explanations
22 regarding what their threatening behavior had been, which they found implausible, and they
23 began to consider him hostile. (Compl. at 19:26–20:25.) They say he did this in a letter
24 dated January 4, 2005, in which he partly relies on an incident on August 31, 2004 to justify
25 the events of June 9, 2004. (*Id.* at 19:26–28, 20:11–13.)

26 Plaintiffs then describe in great detail the events of August 31, 2004, which involve
27 Defendant DeSonia. (Compl. at 20:27–22:22.) They contend DeSonia came to their
28 residence without an appointment, in violation of the agreement. Ms. Mednansky, who says

1  she was immediately afraid, asked why DeSonia was there. DeSonia replied she was there
2  to conduct the annual inspection. Ms. Mednansky told DeSonia her presence there was
3  causing her emotional distress. The fact that DeSonia had not been present on June 9 did
4  not calm Ms. Mednansky's fears, because she says the mere sight of a Forest Service
5  employee or vehicle caused her nervousness and distress. Without addressing that
6  concern, DeSonia said she "could just about do the inspection from where she was
7  standing," (*id.* at 21:15–16), but then asked to move closer to the residence.

8      Mr. Mednansky exited his residence in time to see Ms. Mednansky and Defendant
9  DeSonia begin walking towards the residence. He asked DeSonia why she was there in
10 violation of the agreement, to which she replied she had called for an appointment. He says
11 he told her he received no call, and suspected she was lying. He also says he was
12 suspicious because she was alone, and not accompanied by armed Forest Service
13 employees (Compl. at 22:4–7), although he provides no explanation why the absence of an
14 armed escort would have made him nervous. Mr. Mednansky then threatened to place
15 DeSonia under a citizen's arrest and sue her for harassment, at which point she left.
16 Plaintiffs allege Defendant DeSonia's appearance at their residence after they had been
17 absent for six weeks caused them to be extremely suspicious and suffer emotional distress.
18 (*Id.* at 22:15–22.)

19     Plaintiffs then return to setting forth their complaint against Defendant Gillett. (Compl.
20 at 22:24–24:2.) They construe his letter as a threat to punish them because he did not like
21 Mr. Mednansky's "attitude, mannerisms, and statements." (*Id.* at 24:2.) They allege that his
22 letter represents retaliation for past correspondence and interactions with the Forest Service.
23 (*Id.* at 24:4–26:4.)

24     The Complaint follows with further allegations concerning events following the events
25 of June 9. (Compl. at 26:6–27:9.) This includes a letter dated November 15, 2004[3] in which
26 they allege Defendant Gillett made frivolous accusations of non-compliance with Forest
27

---

28     [3] This letter is not included in the briefing materials, but may refer to the second letter Gillett wrote, dated September 29, 2004.

1  Service requirements in order to retaliate against them and threatened to revoke their permit. In addition, after Plaintiffs again complained — this time, to Dr. Fege's successor Tina Terrel — they allege Defendant Gillett called them a second time on March 31, 2005, which they say violated the "'no call' demand" and which led them to threaten to sue him for harassment. They contend Gillett wrote them another letter, this one dated September 7, 2005, identifying non-compliance issues including several new ones. Plaintiffs believe the letters identifying compliance issues are intended to punish them.

Plaintiffs also allege that around January, 2006, Defendant DeSonia embarked on a three-month series of daily drive-bys. (Compl. at 27:8–9.) After recounting attempts to obtain administrative relief, Plaintiffs continue by describing these drive-bys. (*Id.* at 29:16–24.) They allege De Sonia drove past their residence daily for no reason, slowed down, stared at their residence, then drove on. They also allege she drove past once again, while not in uniform, in October of 2006. (*Id.* at 29:24–27.) Plaintiffs allege a neighbor not employed by the Forest Service also conducted a series of drive-bys, which they speculate is somehow related to Defendant DeSonia's actions. (*Id.* at 30:4–26.) Plaintiffs say they interpreted the drive-bys as an expression of control and intimidation, and as a result they felt tension and anxiety. (*Id.* at 31:1–20.) They allege Ms. Mednansky suffered severe health problems as a result.

Plaintiffs allege the June 9 inspection ordered by Gillett violated Forest Service policy requiring Forest Service employees to make contact with permit holders to attempt to resolve problems before taking other action. (Compl. at 33:14–17.)[4]  The content of this policy is found in the Forest Service Manual. The policy does not appear to be the kind of regulation which could give rise to a private right of action for damages, because it is hortatory and gives advice to employees.

/ / /

---

[4] Neither party included the text of the manual in their briefing, but a copy of what appear to be the relevant documents are available online at the Forest Service's website at www.fs.fed.us/im/directives/fsm/2700/2720.doc and at www.fs.fed.us/specialuses/documents/fsm_2710_feb02.doc.

Plaintiffs have also made numerous allegations against other named and unnamed persons who are not Defendants in this case. In their opposition to the motion to dismiss, they attempt to raise other claims, such as violation of neighbors' civil rights, obstruction of justice, property theft, and damage to the residence. Such claims are not set forth in the Complaint, however, and are therefore not before the Court.

## II.     Motion for Leave to File Sur-Reply

After briefing was complete in this action, the Court took the hearing off calendar and took Defendants' motion to dismiss under submission pursuant to Civil Local Rule 7.1(d)(1). Mr. Mednansky nevertheless appeared for the hearing, at which he presented two more pleadings, identified as declarations of facts by himself and Ms. Mednansky. By a separate order issued January 29, 2008, the Court accepted these for filing. Plaintiffs thereafter filed a sur-reply, which the Court construed as a motion for leave to file a sur-reply.

The proposed sur-reply focuses chiefly on picking holes in the motion to dismiss and is thus only marginally useful. Arguments not raised in the opening brief are ordinarily waived, *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006), so in most cases a sur-reply serves little purpose. Nevertheless, in view of Plaintiffs' status as *pro se* litigants, the Court will accept the sur-reply for filing. Plaintiffs are, however, admonished they cannot rely on their *pro se* status to excuse failure to comply with the rules, *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987) as they have repeatedly attempted to do.

The sur-reply includes a request that the Court reconsider its previous order denying them an extension of time in which to serve certain of the individual Defendants. (Sur-Reply at 8:22–9:7.) Not only is this request a violation of ¶ 4(j) of the Court's standing order and thus improper, it also lacks merit. Plaintiffs urge the very same reasons the Court rejected previously. Even worse, their argument is even weaker because their request shows they were still unprepared to serve these Defendants even after the passage of more time. This request is **DENIED** and Plaintiffs are admonished to review the Court's standing order.

/ / /

/ / /

**III.     Legal Standards**

Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(2), (5), and (6). Defendants Gillett and DeSonia have moved to dismiss under Rule 12(b)(6).

**A.  Rule 12(b)(2) and 12(b)(5)**

Defendants contend the individual Defendants have not been properly served and, therefore, the Court lacks jurisdiction over them.  The Court lacks jurisdiction over Defendants who have not been properly served in accordance with Fed. R. Civ. P. 4.  *S.E.C. v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007) (citations omitted).

Under Rule 4(m), on motion or *sua sponte* after notice, the Court must dismiss the action without prejudice against any defendant who has not been properly served within 120 days of filing the complaint, unless the time is extended for good cause.

Under Rule 4(i), employees of the United States sued in their individual capacity must be served personally as provided under Rule 4(e), (f), or (g), and the United States must also be served. Because a *Bivens*-type action can be maintained against Defendants only in their individual capacity, personal service is required, and Plaintiffs may not serve individual Defendants merely by delivering a copy of the summons and complaint to Defendants' place of employment.  *Daly-Murphy v. Winston*, 837 F.2d 348, 355 (9th Cir. 1987).

**B.  Rule 12(b)(6): Failure to State a Claim**

A Rule12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001).

Dismissal is warranted where the complaint lacks a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984); *see Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.")  Alternatively, a complaint may be dismissed where it presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson*, 749 F.2d at 534; *see Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  When a Rule 12(b)(6) motion is granted, leave to amend is ordinarily denied only

/ / /

when it is clear that the deficiencies of the complaint cannot be cured by amendment. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

In reviewing Rule 12(b)(6) motions, the court must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party, including all reasonable inferences to be drawn from the facts alleged. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). However, legal conclusions need not be accepted as true merely because they are cast in the form of factual allegations. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

Generally when reviewing a motion to dismiss for failure to state a claim, the Court examines only the contents of pleadings. *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds* in *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). When the complaint alleges the content of a document, however, and no party questions its authenticity, the Court may consider the contents of the document even if it is not attached to the pleading. *Branch* at 454.

Because Plaintiffs are proceeding *pro se* and are bringing civil rights claims, the Court construes their pleadings liberally. *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 623 (9th Cir. 1988). The Court may not, however, supply essential elements of the claim that were not initially pled. *See Ivey v. Board of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).

Defendants have raised the defense of qualified immunity, which bars claims for money damages against public officers to the extent their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

**IV. Discussion**

    **A. Failure to Serve Individual Defendants**

Plaintiffs attempted to serve the individual Defendants by mailing summonses and copies of the complaint to the United States Department of Agriculture's Office of General Counsel in San Francisco, which is insufficient under Rule 4. After Defendants moved for

1  dismissal, Plaintiffs, apparently realizing their error, on December 5, 2007 filed an *ex parte*
2  application for additional time to serve the individual Defendants.  The Court denied the
3  application as to all individual Defendants except Gillett and DeSonia, who by that time had
4  been served personally.
5  Because Plaintiffs failed to serve the remaining Defendants within the time permitted,
6  claims against all individual Defendants except for Defendants Gillett and DeSonia are
7  **DISMISSED WITHOUT PREJUDICE**.

      **B.**     **Failure to State a Claim**

           **1.**   **Defendant DeSonia**

10  Plaintiffs' allegations against Defendant DeSonia are minimal.  According to the
11  Complaint, DeSonia came Plaintiffs' house to conduct one of the required inspections and
12  began talking with Ms. Mednansky.  This was Plaintiffs' first encounter with DeSonia.
13  DeSonia and Ms. Mednansky began walking together towards the house when Mr.
14  Mednansky came out and told her to leave, which she did.  Plaintiffs allege Ms. Mednansky
15  fears Forest Service employees, though they allege nothing threatening Ms. DeSonia said
16  or did.  While Plaintiffs argue they have an agreement contract with the Forest Service or
17  Defendants Tobin or Gillett requiring all Forest Service employees to get an appointment
18  before coming to their house, they have not alleged Defendant DeSonia was a party to this
19  agreement.
20  Plaintiffs allege Defendant DeSonia then over a period of three months drove past
21  their house once a day, slowed down, and stared towards their house.  They allege she
22  drove past their house once more months later.  Plaintiffs' remaining allegations pertain to
23  their own suspicions about the meaning of DeSonia's actions, and about why a neighbor was
24  also driving past their house.
25  Construing the Complaint liberally, Plaintiffs have alleged Defendant DeSonia failed
26  to get their permission before showing up at their residence to conduct the inspection, but
27  left when told to go.  She did not return, but allegedly drove past their house regularly and
28  looked at it from the road while continuing to drive.  In essence, what Plaintiffs have alleged

is that Defendant DeSonia was trying to inspect their residence pursuant to their Special Use Permit, but in a manner they subjectively interpreted as some kind of threat or intimidation. They allege no objective facts that would have put Plaintiffs in reasonable fear for their safety. As discussed more fully below, Plaintiffs have failed to plead sufficient facts showing the existence of an agreement purporting to modify the Special Use Permit. No facts have been pleaded to show Defendant DeSonia was bound by this agreement, nor that Defendant DeSonia knowingly violated the agreement, even assuming it was enforceable against her.

Plaintiffs make a few more vague allegations about Defendant DeSonia, such as stating "her position with FS would naturally have involved her with permit holder issues." (Compl. at 37:9–10.) They allege her involvement in a conspiracy which, they allege, she somehow aided and abetted by her drive-bys. (*Id.* at 37:7–12.) They allege she disclosed private facts by informing their neighbor about the drive-bys. (*Id.* at 40:1–4, 43:4–7.) The nature of these private facts is never alleged.[5]

Without more, these allegations do not state a claim under any theory upon which any relief may be granted. The Court therefore need not reach the qualified immunity issue, although it were to do so, dismissal would be granted with leave to amend because the allegations do not show Defendant DeSonia's actions violated Plaintiffs' clearly established Constitutional or statutory rights. Plaintiffs' claims against Defendant DeSonia are therefore **DISMISSED WITHOUT PREJUDICE**.

### 2. Defendant Gillett

Plaintiffs have attached Gillett's three letters to their opposition to the motion to dismiss. These, together with a phone call and the November 15, 2004 letter, constitute the alleged communications between Plaintiffs and Defendant Gillett. The Court therefore may, and does, consider these letters. *Branch*, 14 F.3d at 454.

---

[5] California recognizes a claim for the tort of invasion of the right to privacy where there has been a public disclosure of private facts which are "offensive and objectionable to a reasonable person of ordinary sensibilities." *Wasser v. San Diego Union*, 191 Cal.App.3d 1455, 1460, 236 Cal.Rptr. 772 (1987). Simply alleging that "private facts" were disclosed is nothing more than a formulaic recitation of the elements of this cause of action and does not suffice to give Defendant DeSonia or other Defendants fair notice of the basis for claims against them. *See Bell Atlantic v. Twombly*, ___ U.S. ___,127 S.Ct. 1955, 1964–65 (2007).

Gillett's letter of July 9, 2004 (the "First Letter") (Opp'n to Mot. to Dismiss, Ex. C1) does not, as Plaintiffs claim, acknowledge the existence of an agreement regarding obtaining appointments before conducting inspections. Rather, it offers to notify Plaintiffs, "as requested by you at an earlier date," when Forest Service employees would be in the area conducting inspections. There is nothing in the letter suggesting any contract to this effect, however. Nor does it agree the Forest Service must await Plaintiffs' approval of the proposed inspection date. The letter is straightforward and offers to purchase a new padlock for Plaintiffs, but warns them they are not permitted to put it on a chain across their driveway and thus impede access to the land.

The letter dated September 29, 2004 (the "Second Letter") (Opp'n to Mot. to Dismiss, Ex. C2), explains the events of June 9, 2004. Contrary to the Complaint's allegations it does not say Defendant Gillett directed Forest Service employees to conduct an "armed invasion." Rather, it says Gillett's employees do not feel safe conducting the required inspections, and therefore he has instructed them "to conduct these inspections with law enforcement accompaniment." The letter also explained that Forest Service trainees were present on that date, and that the sheriff's unit happened to be in the area and offered to assist. The letter acknowledges that "[i]n hindsight, this number of law enforcement personnel was excessive for the situation." Nothing in the letter suggests Gillett directed the events of June 9 beyond this. The Second Letter contains no remarks that, in context, could reasonably be construed as intimidating or threatening. The remark Plaintiffs seize on, "I will not hesitate to take whatever actions are necessary to protect my employees who administer the terms and conditions of the Special Use Permit," in context and in view of Plaintiffs' own allegations is referring to Gillett's intention to protect his employees from any harm Plaintiffs might attempt and is not reasonably construed as a threat to affirmatively harm Plaintiffs.

The letter dated January 4, 2005 (the "Third Letter") is incomplete. The attached portion, however, acknowledges a telephone conversation on December 9 in which Defendant Gillett offered to meet personally with Mr. Mednansky. It notes Mr. Mednansky's refusal to meet with Gillett or discuss any issues with him until the events of June 9 had been

explained to Mr. Mednansky's satisfaction. The letter then goes on to discuss incidents described above, explaining how Forest Service employees felt they were being intimidated and hindered in the course of carrying out their duties.

Plaintiffs have also alleged what was said in the phone call and the November 14, 2004 letter. In the letter, Plaintiffs allege, Gillett accused Plaintiffs of not complying with applicable regulations, and threatened to revoke their permit. (Compl. at 26:12–16.) In the phone call, he asked to meet them in person. (*Id.* at 19:12–16, 26:17–18.)

On reading the three attached letters, together with Plaintiffs' summary of the November 14 letter and the phone call, it is apparent Plaintiffs have grossly misconstrued the nature of these communications. There is nothing on the face of the letters that would tend to show Gillett was fabricating anything as Plaintiffs have argued. These communications do not constitute illegal threats nor do they give rise to any other cause of action.

The events of June 9, 2004 require closer examination. It is apparent Defendant Gillett instructed Forest Service employees to have law enforcement officials with them, but Plaintiffs have not alleged he authorized any show of force or an "armed invasion" as Plaintiffs have described it. The Complaint makes plain Mr. Mednansky was not present, and alleges Ms. Mednansky was initially not afraid. Whether or not Ms. Mednansky should have been afraid (Mot. for Leave to File Sur-Reply at 8:11–14), according to the Complaint, she in fact was not. Rather, she says she initially thought the Forest Service employees were at the wrong house, and went outside to question them. Even though she says they initially positioned themselves around her house and brandished their guns, it was only after beginning to question them that she began to feel frightened, not because of any threats they made or anything they did after that point, but because she began to doubt their intentions. (Complaint at 6:25–26, 7:27–8:2 (alleging Ms. Mednansky became frightened

/ / /

/ / /

/ / /

only after talking with Forest Service employees). *But see id.* at 6:4–6 (alleging she became frightened as soon as she saw the employees' guns and formation).)[6]

According to the Complaint, the Forest Service employees told Ms. Mednansky she and her husband had no right to keep garbage or to maintain a locked gate, and only had rights to their residence, not the surrounding area. Their tone, she implies, was rude and confrontational.

Essentially what Plaintiffs are complaining about is the presence of armed Forest Service employees doing a fire inspection on their property who were rude to Ms. Mednansky. She alleges she was subjectively terrified, although the reasons for her terror during these events are unclear. Plaintiffs say they believe Forest Service employees are conspiring against them. Ms. Mednansky's later Declaration of Facts (Docket no. 34) shows she later thought of the events of Ruby Ridge and after the fact speculated she might have been the victim of an unprovoked attack (Decl. at 2:18–20), and she was particularly afraid because the Forest Service employees evoked in her mind thoughts of the Nazi rise to power (Compl. at 45:2–5) although she has alleged no objective facts that would have sufficed to create this impression.

Even assuming these events gave rise to a cause of action, Plaintiffs have only alleged Defendant Gillett sent the Forest Service employees to do a fire inspection and directed that they be accompanied by law enforcement personnel. By themselves, such allegations do not state a claim. There is no allegation showing Defendant Gillett instructed

---

[6] While the Court construes the pleadings in the light most favorable to Plaintiffs, the Complaint's lone allegation that Ms. Mednansky was immediately afraid contradicts all other allegations. The inconsistent allegation is found in the Complaint at 6:4–6, which says "When [she] noticed the weapons and the style of the formation around her residence she became frightened." As noted, Plaintiffs twice alleged she became frightened only after talking with them. Furthermore, Plaintiffs earlier alleged in painstaking detail how the Forest Service employees arrived, brandished their weapons, and got into formation. (Compl. at 5:8–27.) Mr. Mednansky was not present at this time, so Ms. Mednansky is the only possible witness to the Forest Service employees' alleged activities before she came out to meet them. The allegation that she first noticed their weapons and position after she exited her house is irreconcilable with these other specific allegations. Directly contradictory factual allegations such as this do not fairly put Defendants on notice of the claims against them. *See Bell Atlantic*, 127 S.Ct. at 1964 (explaining that Fed. R. Civ. P. 8(a)(2) requires a complaint to give the defendant fair notice of what the claim is and the grounds upon which it rests).

anybody to threaten or intimidate Plaintiffs, terrorize them, or use any kind of force on them, or that he approved such actions. Absent such allegations, Defendant Gillett cannot be held liable under a *Bivens* theory. *Terrell v. Brewer*, 935 F.2d 1015, 1018 (9th Cir. 1991) (holding that supervisory personnel cannot be held liable in a *Bivens* action for the actions of their employees under a theory of respondeat superior). At most, Plaintiffs have alleged that the officers present at the scene conspired together. (Compl. at 37:1–4.)

Because Plaintiffs have failed to allege facts connecting Defendant Gillett with the specific way in which the events of June 9, 2008 unfolded or the actions of individual Forest Service employees on the scene, the allegations, if proved, would not show he caused any Constitutional or other violations that may have occurred there.

Furthermore, there is no showing Defendant Gillett would have known his actions or the actions of the officers violated Plaintiffs' Constitutional rights. In *Robinson v. Solano County*, 278 F.3d 1007, 1015 (9th Cir. 2002), for example, the Ninth Circuit first held that pointing a gun to the head of an apparently unarmed suspect during an investigation can be a Fourth Amendment violation. *See also Tekle v. United States*, 511 F.3d 839, 845 (examining excessive force cases). A search of case law uncovered no case establishing that as of June 9, 2004, law enforcement officers' being armed and appearing "ready for action," without more, constituted excessive force or any other Constitutional violation. Because Plaintiffs have failed to allege that Forest Service employees did anything more than get into formation and display their weapons, Defendant Gillett would thus be entitled to qualified immunity.

Plaintiffs have cited 42 U.S.C. §§ 1985(3) and 1986 as giving rise to claims against Defendants. The only Defendant this even arguably applies to is Defendant Gillett. Plaintiffs have failed, however, to allege he participated in a conspiracy against them, which is a statutory element of a §1985(3). A § 1985 claim is, by the terms of § 1986, a prerequisite for a § 1986 claim. Even if they had alleged his involvement in a conspiracy, Plaintiffs have failed to do so with the degree of specificity required to put him or other Defendants on notice of the nature of that conspiracy, and the Complaint does not adequately identify

1 Constitutional violations or a conspiracy to violate Constitutional rights. *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 929 (9th Cir.2004) ("To state a claim for conspiracy to violate constitutional rights, 'the plaintiff must state specific facts to support the existence of the claimed conspiracy.'") (quoting *Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989)); *Harris v. Broderick*, 126 F.3d 1189, 1196 (9th Cir. 1989) (*Bivens* action).

The Court therefore need not reach the remainder of Defendants' arguments regarding his liability, although Plaintiffs should be aware the qualified immunity and Constitutional analyses appear to be well-taken. If Plaintiffs' claims against Defendant Gillett were not already subject to dismissal for the reasons already given, it would be subject to dismissal for the reasons set forth in Defendants' motion to dismiss. If Plaintiffs choose to amend their Complaint, they should take care to avoid errors identified in the motion to dismiss, particularly at 9:12–17:19.

Plaintiffs' claims against Defendant Gillett are thus **DISMISSED WITHOUT PREJUDICE**.

### 3. Defendant United States

The United States is named as a Defendant and Defendants concede it has been served. The United States is protected by its sovereign immunity, except to the extent immunity has been waived. *Balser v. Dep't of Justice, Office of U.S. Tr.*, 327 F.3d 903, 907 (9th Cir. 2003). The only theory of recovery under which Plaintiffs might recover is therefore the Federal Tort Claims Act, or FTCA, for a tort under California law.

Plaintiffs set forth arguments for claims for negligent infliction of emotional distress, intentional infliction of emotional distress, and invasion of privacy. Plaintiffs allege facts that, if proven, would show Forest Service employees subjected them to a large number of indignities and rude and high-handed behavior. While they construe much of this behavior, such as Gillett's letters, as threatening harm, the alleged facts do not support such claims.

/ / /

/ / /

/ / /

### 1. Invasion of Privacy

Under California law, a plaintiff may recover damages from a defendant

> who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Miller v. National Broadcasting Co.*, 187 Cal.App.3d 1463, 1482, 233 Cal.Rptr. 668 (1986) (quoting Restatement Second of Torts, § 652B). Nothing in the Complaint suggests such an intrusion.

The Complaint alleges various Forest Service employees appeared outside Plaintiffs' residence in connection with the performance of their duties — conducting inspections, notifying Plaintiffs of non-compliance issues, and the like. Holders of special use permits consent to these visits as part of the agreements that permit them to reside on public land, so it is clear such intrusions are not "highly offensive to a reasonable person." Even if Plaintiffs believed they had a special arrangement with the Forest Service, an unannounced visit from a uniformed Forest Service employee would not be "highly offensive to a reasonable person." Nor is it apparent why their presence on public land around Plaintiffs' residence could reasonably be construed as intruding on Plaintiffs' private affairs.

### 2. Intentional Infliction of Emotional Distress

Plaintiffs allege in painstaking detail the emotional trauma and distress they have experienced, along with some physical symptoms. While this would suffice to show they suffered emotional distress, the Court must determine whether their allegations would support a claim of either intentional or negligent infliction of such distress.

Under California law, the tort of intentional infliction of emotional distress includes three elements:

> (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the plaintiff's injuries actually and proximately caused by the defendant's outrageous conduct.

*Cochran v. Cochran*, 65 Cal.App.4th 488, 494, 76 Cal.Rptr.2d 540 (1998) (citation omitted). To establish the first element, the conduct "must be so extreme as to exceed all bounds of

that usually tolerated in a civilized community." *Id.* "The tort does not extend to mere insults, indignities, threats, annoyances, petty oppressions and other trivialities." *Id.* at 496 (internal quotation marks, alterations, and citations omitted.)

The allegations, if proved, would support the second and perhaps the third element of this tort, but Plaintiffs have failed to plead facts to establish the first element. While Plaintiffs allege they suffered emotional torment and distress, they have failed to show they suffered anything more than mere insults, indignities, threats, annoyances, or petty oppressions to cause it. Even considering the pattern of behavior by all Forest Service employees, Plaintiffs have failed to plead facts to show why the actions of the Forest Service or its officers or employees exceeded all bounds tolerated in a civilized community. The pleadings make it apparent Plaintiffs have been actively attempting to keep Forest Service employees away and resisting their efforts to conduct required inspections. Some amount of resistance to Plaintiffs' efforts is to be expected. The events described in the Complaint do not rise to the required level.

### 3.  **Negligent Infliction of Emotional Distress**

The tort of negligent infliction of emotional distress, whether under a "direct victim" or "bystander" theory, requires the existence of a duty owed to Plaintiffs and breach of that duty. *Cohen v. NuVasive, Inc.*, 164 Cal.App.4th 868, 876, 79 Cal.Rptr. 759, 764 (2008) (citations omitted). No other tort has been alleged or is apparent, and infliction of emotional distress is not itself an independent tort. 6 Witkin: Summary of Cal. Law Torts, § 1004(2)(c) (10th ed. 2005). The only other source of a duty which might have been violated is the oral agreement regarding appointments. With few exceptions, California law does not permit recovery under this theory for breaches of agreements. *Erlich v. Menezes*, 21 Cal.4th 543, 551–52, 87 Cal.Rptr.2d 886 (1999). The exceptional cases include situations where a tort is also a contractual breach. *Id.* at 551. Failure to obtain an appointment before conducting an outdoor inspection of public land, even assuming the agreement is enforceable as a contract, is not a tort.

/ / /

Because the United States is immune to all other claims, all tort claims against the United States are **DISMISSED WITHOUT PREJUDICE** but all other claims are **DISMISSED WITHOUT LEAVE TO AMEND**.

### C.     Other Briefing Issues

In the interests of avoiding unnecessary rounds of briefing, Plaintiffs are advised to consider the following points if they decide to amend. Plaintiffs need not respond to these points directly.

Plaintiffs agree the Special Use Permit provides for inspections, but they maintain the terms of the permit were modified by an oral agreement with Defendant Tobin so that Forest Service employees need an appointment before conducting the required inspections at or near Plaintiffs' residence. While Plaintiffs have not directly sought to enforce the terms of the oral amendment, and thus Defendants had no reason to brief the issue, such an agreement may well be unenforceable under either federal or state law both because of the statute of frauds and because it appears to be a gratuitous promise. In other words, the promise appears to have been made out of courtesy for Plaintiffs, but Forest Service employees might not be bound by it or made to pay damages for breaching it. Neither party submitted a copy of the Special Use Permit or any other written agreement, so the parties' summary allegations are the only information before the Court showing what the terms of such agreements might be.

## V.     Conclusion and Order

For these reasons, Plaintiffs' claims against Defendant DeSonia are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs' claims against Defendant Gillett are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs' tort claims against the United States are **DISMISSED WITHOUT PREJUDICE**.

For reasons set forth above, Plaintiffs' claims against all other Defendants are **DISMISSED WITHOUT PREJUDICE** for failure to timely serve them with process. Plaintiffs' claims against the United States, other than tort claims under the FTCA, are **DISMISSED**

/ / /

**WITHOUT LEAVE TO AMEND**.  This disposes of all claims in the Complaint, which is therefore **DISMISSED WITHOUT PREJUDICE**.

Because it is not absolutely clear Plaintiffs' claims against Defendants DeSonia and Gillett, and Plaintiffs' tort claims under the FTCA against the United States cannot be saved by amendment, Plaintiffs will be permitted to amend their Complaint to remedy the defects identified in this order.  They may do so by filing an amended complaint no later than **thirty calendar days from the date this order is entered**.  If Plaintiffs wish to add new claims or parties, they must first obtain leave to do so.  The amended complaint must not include claims dismissed without leave to amend.

**IT IS SO ORDERED**.

DATED:  September 30, 2008

*[signature: Larry A. Burns]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge